Citizens National Bank, Appellant, *v.* Mc-
Cafferty, Appellant.

Argued November 22, 1955. Before STERN, C. J., STEARNE, JONES, BELL, MUSMANNO and ARNOLD, JJ.

*W. D. Gallup,* with him *E. G. Potter, Robert J. Healy* and *Gallup, Potter & Healy,* for contestant.

*James F. McVay,* for proponents.

OPINION BY MR. JUSTICE BELL, January 4, 1956:

An issue devisavit vel non was tried by a Judge and jury in the Court below. The jury found that at the time of execution of the will dated July 3, 1951, Minnie S. McCafferty, the testatrix, was a person of sound and disposing mind and that the said will was not procured by undue influence, duress or constraint. Delevan Mc-Cafferty, a stepson, filed (1) a motion for judgment non obstante veredicto, which was dismissed by the Court below, and (2) a motion for a new trial, which was granted by the Court below. Thereafter each side took an appeal.

Mrs. McCafferty by her will dated July 3, 1951,* left one-half of her estate to her stepson, Delevan A. McCafferty, who lived in San Diego, California, and *whom she had not seen since* her husband's death in *1943,* and the remaining one-half of her estate to her nephew, Matthew F. Slattery, Jr., and Violet L. Slattery, his wife, who nursed her through her long last illness. Although testatrix had executed a will on April 3, 1939, in which she left all of her estate to her stepson, Delevan A. McCafferty, her 1951 will could not be said to be (as the stepson contends) an unnatural will, nor—as between the stepson on the one hand and her nephew (the son of her own brother) and his wife on the other hand—was the latter a *stranger to the blood,* as that expression is used in our cases.

The voluminous testimony may be thus summarized:

### Proponents' testimony

Minnie S. McCafferty died September 12, 1951, at the Emery Hotel, Bradford, Pa., where she had been living since February 1951. She was 76 years old. She had had a cerebral vascular accident in November, 1950, which required hospitalization until February, 1951. Her left side was paralyzed and she was crippled by a bad arthritic condition in her knees, fingers and arms. Her activities were confined to a wheelchair, although several times a week she would be taken out for an automobile ride. While she was in the hospital she was at times confused and her memory was impaired. After she was discharged from the hospital in February 1951 and moved to the Emery Hotel, she made a "very radical improvement" in her mental condition and according to proponents' witnesses had thereafter a clear, normal, keen mind. The only evi-

---

* Citizens National Bank of Bradford was appointed executor.

dence to the contrary, such as it was, was that of a "night sitter".

The proponents of the will, Mr. and Mrs. Slattery, who called Mrs. McCafferty "Aunt Min", proved—(1) by the attorney who at Mrs. McCafferty's request drew and witnessed the will and (2) by Dr. R. K. Russell, the other subscribing witness, who had known her for forty years and had been her doctor since 1935, and who at her request saw her almost daily for the last ten months of her life, that Mrs. McCafferty was of sound and disposing mind, memory and understanding on July 3, 1951, at the time of the execution of the will. Dr. Russell likewise testified that *on that day and during all the time she lived at the Emery Hotel until her death her mind was clear and keen and she was mentally competent to make a will.*

Dr. Joseph A. Kervin who saw Mrs. McCafferty while Dr. Russell was on vacation in June 1951 and in August 1951, likewise testified that her mind and mental condition were absolutely clear and sound and he never saw her confused. They were corroborated by a real estate broker and by ten witnesses, Mrs. Frances Madigan, Dorothy Vecellio, Anna Hall, Helen Ledden, Mildred DeWeese, Vivian Vecellio, Theresa Smith, Christine Sebastian and Carl Beyeler, who were employed in various capacities in the Emery Hotel and saw her and talked to her nearly every day in her room at the Emery Hotel or in the hotel lobby for from five minutes to half an hour. All of them testified that she had a clear and normal mind—many of them said she had a keen mind.

William P. McVay was an attorney at law who had resided in McKean County for about thirty-four years. Mrs. McCafferty had been a friend of his family. He had been doing some legal work for Mrs. McCafferty commencing in the latter part of May and through

June 1951. He discussed with Mrs. McCafferty her proposed will of July 3, 1951; he prepared it for Mrs. McCafferty at her request; explained it to her; saw her sign it, and witnessed it with Dr. Russell. *Mrs. Slattery was never present at these conferences nor was the will ever discussed with her.* Mr. McVay's testimony is so convincing that we shall quote a few excerpts therefrom: "Q. Would you state to the court under what circumstances this document was drawn and prepared? A. I had been doing some legal work for Mrs. McCafferty prior to July 3, 1951, and at one time she had inquired of the possibility of making a new will. She informed me that she had made a previous will jointly with her husband. She exhibited to me what I understood to be a certified copy of that prior will. She asked my opinion as to the provisions of that will. I explained to her the provisions of that will as I understood them. She then discussed with me the matter of the provisions of a new will which she contemplated making. *She discussed the various persons whom she might or might not consider in her will.** She spoke of her nephew, Matthew Slattery, and his wife, Mrs. Slattery, who was her nurse at that time, one of her nurses, I believe. There may have been others. She spoke of her stepson and she spoke of Beth McCafferty Putnam who I understood to be the daughter of a Mr. Charles McCafferty who was the brother of William McCafferty, Minnie McCafferty's husband. She would be, I believe, a niece by marriage. Mrs. Putnam would be a niece by marriage of Minnie McCafferty. . . . Q. Mr. McVay, I show you Plaintiffs' Exhibit No. 1 which has been marked for identification and ask you to examine that document. I now ask you if, after examining that document, any other discussion as to the disposition of her

---

* Italics throughout, ours.

property was had with Mrs. McCaffery, other than what appears in that will. A. Well, as a part of the discussion, Mrs. McCafferty considered or mentioned the possibility that she might leave *a third of her property to her stepson,* a third to her nephew, Matthew Slattery, and a third to Mrs. Violet Slattery, the wife of Matthew Slattery. She was, I would describe it as thinking out loud as to what the possibilities were, what she ought to do, and her conclusion, her final conclusion was that the property would be left as is provided in the will *under her instruction,* one-half to her stepson, Delevan McCafferty, and one-half to Matthew and Violet Slattery together. . . . Q. Mr. McVay, would you say that in your conversations with Mrs. McCafferty on these different occasions, whether they might have been legal matters or otherwise, that she was a person of *keen perception?* A. In my opinion she was. We sometimes on a couple of these occasions discussed the matter of *disposition of her home and the contents of it, the matter of whether there was sufficient fire insurance coverage on it, sufficient public liability coverage* in the event someone fell on the sidewalk, different matters of that kind. Some of those matters I suggested to her and others she brought up herself and asked me about. . . . Q. Did you discuss the preparation of this will with anyone prior to the time it was prepared? A. *The only person* with whom I had any discussion concerning this will prior to the time of its preparation *was with Mrs. McCafferty herself.* . . . Q. At whose request was this will prepared? A. *At the request of Minnie S. McCafferty.* . . . Q. *Did you ever discuss the will or the contents of the will prior to the execution of it with either Mrs. Slattery, Mr. Slattery or the Citizens National Bank?* * A. *No,*

---

* The executor.

*I didn't.* . . . Cross Examination . . . Q. In executing the will just what did you do? A. I first presented the will to Mrs. McCafferty. *She looked it over. I read it to her.* I asked her if there was anything that she did not understand in connection with it or if there was anything that she wanted added or removed from it, tried to *thoroughly explain all of the provisions of the will.* I then asked her if she understood what it was and what it purported to be. *She said she did,* that she understood it to be the last will which was giving one-half of her property to her stepson and one-half to the Slatterys, and I asked her if she was willing to execute it, if that was her intention. She said it was."

Henry Satterwhite, the general manager of the hotel, testified that he frequently discussed with Mrs. McCafferty political questions of local and national importance, and that she was very familiar with current events and had wide and diverse interests. All of these witnesses not only testified that Mrs. McCafferty had a clear normal mind but in addition gave facts to support their conclusions.

A real estate broker, Carroll Clayton, discussed with Mrs. McCafferty the sale of her house in May 1951. She described the property, both land and building, in great detail; told him how wonderful it was; told him what price she wanted to get; why she thought it was worth that much and that she would not take less. Mr. Clayton testified that she had a strong and definite mind. When he could not secure a purchaser for the price she asked, she refused to reduce the price.

The testimony in favor of Mrs. McCafferty's nephew and niece, the Slatterys, was so strong, and the testimony in favor of Delevan A. McCafferty, her stepson, so weak, that, as we shall see, if the jury had rendered a verdict in favor of the stepson it could not have been sustained.

*Defendant's testimony*

The evidence on behalf of Mrs. McCafferty's stepson, Delevan McCafferty, was substantially as follows: Five witnesses testified that when Mrs. McCafferty was in the hospital in November and December, 1950 and January 1951, she was confused and often did not know where she was or who various people were. Such testimony is valueless in view of her recovery when she was discharged from the hospital five months before she made her will.

Izora Lynch, a practical nurse, who was with her at the Emery Hotel from February 4th to late in May 1951, testified that Mrs. McCafferty was *at times* confused and did not always know where she was or who various people were. Mrs. Rutledge, who admitted she was unfriendly to Mrs. Slattery because the latter would not give her coffee and rolls but made her pay twenty cents for the same, was a sitter on the night shift from February 6th until Mrs. McCafferty's death. She sat from approximately ten or eleven o'clock at night until approximately ten o'clock the next morning. When she came on duty Mrs. McCafferty was usually asleep. She testified Mrs. McCafferty was confused "and did not know where she was half the time". Her desire to defeat the Slattery legacy was apparent from the very commencement of her testimony. For example, when she was asked on direct examination: "Q. What was her physical condition? A. Well I would say she was mentally ill."

So far as mental incapacity or mental weakness is concerned, that was the sum and substance of the case presented by the testatrix's stepson, and it is quite obvious that it was insufficient to satisfy his burden of proving by clear and strong evidence either mental incapacity at the time of the execution of the will or mental weakness within the meaning of the cases.

Defendant contends (a) that Violet Slattery occupied a confidential relationship to Mrs. McCafferty (Aunt Min) as a matter of law; (b) that she instead of her stepson, Delevan McCafferty, was a stranger to the blood, and (c) that since Mr. and Mrs. Slattery received a large gift under the will, a presumption of undue influence arose which they failed to overcome. The evidence, as we shall see, was not adequate to prove any—let alone all—of the stepson's contentions.

In *Williams v. McCarroll,* 374 Pa. 281, 97 A. 2d 14, we said: "Moreover, where a will is drawn by decedent's attorney and proved by subscribing witnesses, *the burden of proving lack of testamentary capacity or undue influence* 'can be sustained *only by clear and strong* or compelling evidence'; and this is especially so if proponents were corroborated by the attending physician: Higbee Will, 365 Pa. 381, 382, 75 A. 2d 599; Franz Will, 368 Pa., supra; Sturgeon Will, 357 Pa., supra; Ross Will, 355 Pa. 112, 49 A. 2d 392; King Will, 369 Pa. 523, 87 A. 2d 469; DeMaio Will, 363 Pa. 559, 70 A. 2d 339.

. . .

" 'Although there are a myriad of cases involving confidential relationship and undue influence, the courts have found it impossible to define precisely these terms. . . " 'Confidential relation is . . . one wherein a party is bound to act for the benefit of another, and can take no [unfair] advantage to himself. It appears *when the circumstances make it certain the parties do not deal on equal terms,* but, on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed; . . . In some cases the confidential relation is a conclusion of law, in others, it is a question of fact to be established by the evidence' ". [Citing cases]." '

"In Phillips' Estate, 244 Pa. 35, 43, 90 A. 457, the Court said: 'When a will is attacked on the ground of undue influence, "It is necessary to bear in mind the meaning of the term . . . ; as a legal phrase it is used as denoting . . . *something violative of legal duty* . . . The word 'influence' does not refer to any and every line of conduct capable of disposing in one's favor a fully and self-directing mind, *but to a control acquired over another which virtually destroys his free agency* . . . In order to constitute undue influence sufficient to void a will, *there must be imprisonment of the body or mind* . . . fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery, or physical or moral coercion, to such a degree as to prejudice the mind of the testator, *to destroy his free agency and to operate as a present restraint upon him in the making of the will.*" [Citing cases].' " See also to the same effect, *May v. Fidelity Trust Company*, 375 Pa. 135, 99 A. 2d 880.

In *Quein Will*, 361 Pa. 133, 62 A. 2d 909, the Court, speaking through Mr. Justice ALLEN M. STEARNE, said: "There is a presumption of the absence of undue influence. The initial burden of proof is on contestant: Cressman Estate, 346 Pa. 400, 31 A. 2d 109; Ross Will, 355 Pa. 112, 49 A. 2d 392. Where there is no evidence of weakened intellect [i.e. no evidence sufficient to prove weakened intellect] the burden is upon those asserting undue influence to prove it even though the bulk of the estate is left to those occupying a confidential relation; Ash Will, supra, and the cases therein cited. . . Where the evidence shows bodily infirmity and greatly *weakened mentality,* and a stranger to the blood of the testator, standing in a confidential relation, is benefited by the will which he has been instrumental in having executed, a presumption of undue influence arises: Adams's Estate, 220 Pa. 531, 69 A. 989;

Phillips' Estate, 244 Pa. 35, 90 A. 457; Schwartz's Estate, 340 Pa. 170, 16 A. 2d 374; Hollinger Will, 351 Pa. 364, 41 A. 2d 554."

There was, we repeat, no evidence of mental incapacity; the evidence of the attorney who drew the will (and with Dr. Russell witnessed it) that the will was the voluntary well understood act of the testatrix was unimpeached; and the evidence was overwhelming that at the time Mrs. McCafferty made her will and for five months prior thereto she had a clear, normal, keen mind and was not a person of weakened mentality. Contrary to the contention of Delevan McCafferty, the burden of proving confidential relationship and undue influence was upon him.

We shall concisely state the facts, even if some be repetitious, upon which Delevan McCafferty bases his contention of confidential relationship and undue influence as well as other important facts relating thereto which Delevan McCafferty has overlooked. Mrs. Slattery was head nurse for her aunt, Mrs. McCafferty; in Mrs. McCafferty's behalf Mrs. Slattery employed and supervised Mrs. Lynch, the practical nurse, and Mrs. Rutledge, the sitter, and arranged for their compensation; Mrs. Slattery ran errands for her aunt, and in her behalf asked Mrs. McCafferty's attorney his opinion in matters relating to the inventory and settling of Mr. McCafferty's estate which had remained unsettled *since his death in 1943.* In June 1951 Mrs. McCafferty appointed Mrs. Slattery attorney in fact *for the purpose of inventorying* the assets in the safe deposit box of Mrs. McCafferty and her late husband, but this power was drawn by Mrs. McCafferty's attorney at her request and could be exercised *only in the presence* of an official of the Bradford National Bank or (subsequently) *in the presence* of either her attorney or his partner. Mrs. McCafferty signed all checks in spite of

the arthritic condition of her fingers. *No evidence was presented to prove that Mrs. Slattery dominated Mrs. McCafferty, nor was there the slightest evidence that they did not deal on equal terms, or that Mrs. Slattery influenced the testatrix in making her will or in any business transaction.*

Neither the will itself nor any contents or provisions thereof were ever discussed with Mrs. Slattery by Mr. McVay nor, so far as the evidence shows, by Mrs. McCafferty. Mr. McVay at testatrix's request drew, explained and together with Dr. Russell witnessed the will. Mrs. Slattery was not present at the execution of the will, and there was no evidence that Mrs. Slattery importuned or even asked Mrs. McCafferty to make a will in her behalf. It is clear from these facts and especially from McVay's testimony that the will was the voluntary and clearly understood will of Mrs. McCafferty.

Even if the jury had not found in favor of the Slatterys, the foregoing facts would not be sufficient to allow a jury to find that a confidential relationship existed between Mrs. Slattery and Mrs. McCafferty— rather, they show that Mrs. Slattery's position was that of a nurse, niece and companion who did errands and cared for and looked after her aunt rather than one of confidential relationship as that term is known to the law.

What about undue influence which the stepson must establish by clear and strong or compelling evidence?

Counsel for Delevan McCafferty vigorously objected to any testimony by Mrs. Slattery to show her relations with Mrs. McCafferty or that she did not exercise any influence over her with respect to her will or otherwise, and further objected to her testifying to anything that occurred in Mrs. McCafferty's lifetime. Both counsel and Court fell into error in believing that

Mrs. Slattery was not a competent witness. §5, cl. [e] of the Act of May 23, 1887, P. L. 158, 28 PS §322, pp. 174, 175 provides: "Nor, where any party to a thing or contract in action is dead, . . . and his right thereto or therein has passed, either by his own act or by the act of the law, to a party on the record, who represents his interest in the subject in controversy, shall any surviving or remaining party to such thing or contract, or any other person whose interest shall be adverse to the said right of such deceased . . . party, be a competent witness to any matter occurring before the death of said party . . . *unless the issue or inquiry be devisavit vel non,* or be any other issue or inquiry respecting the property of a deceased owner, *and the controversy be between parties respectively claiming such property by devolution* on the death of such owner, in which case all persons shall be fully competent witnesses."

This was as above noted an issue devisavit vel non and the controversy was between parties claiming Mrs. McCafferty's property by devolution in which case, as the Act specifically says, *all persons shall be fully competent witnesses.* It is clear that Mrs. Slattery was a competent witness to prove her relations with the testatrix and that the testatrix was mentally competent and that she did not influence her in making her will: Cf. *May v. Fidelity Trust Company,* 375 Pa., supra; *Phillips' Estate,* 244 Pa. 35, 90 A. 457; *Central Trust Co. v. Boyer,* 308 Pa. 402, 162 A. 806; *Zakatoff Will,* 367 Pa. 542, 81 A. 2d 430; *Dalbey's Estate,* 326 Pa. 285, 192 A. 129.

Delevan McCafferty relies heavily on the testimony of Mr. McCommon, an attorney, to establish undue influence. Mr. McCommon was in an unusual position. He had offices with Mr. Melvin until the latter's death in June 1948. Mr. Melvin was attorney for *Mr.* Mc-

Cafferty's estate, but for undisclosed reasons the estate was never settled in the eight years prior to Mrs. Mc-Cafferty's death in September 1951. Mr. McCommon testified that he prepared an income tax return for Mrs. McCafferty for the years 1947 to 1950 inclusive, but never made any charge therefor and did not consider himself attorney for Mr. McCafferty's estate or for Mrs. McCafferty, although he or his secretary discussed these and other matters over the telephone with Mrs. McCafferty in those years. He testified that Mrs. Slattery asked him in May 1951 if he would draw a will leaving her a "slice" of Mrs. McCafferty's estate for her services. He replied that he would draw such a will provided the amount was reasonable for her services and if Dr. Russell told him that Mrs. McCafferty was competent to make a will. On cross examination he testified that he would have drawn a will leaving Mrs. Slattery whatever Mrs. McCafferty desired to give her, if Mrs. McCafferty asked him to do so. This testimony is not sufficient, even when considered with all the other testimony in the case, to prove undue influence.* Even if Mrs. Slattery had asked, and there was no proof she did, her aunt to leave her a share of her estate, that would not amount to undue influence unless coupled with other evidence—of which there was none—showing imprisonment of Mrs. McCafferty's mind or fraud or threats or inordinate flattery to such a degree as to destroy Mrs. McCafferty's free agency and to operate as a present restraint upon her in the making of the will.

---

* We note in passing that Mr. McCommon never accused Mrs. Slattery of undue influence, nor could he have suspected her of undue influence because, if he had, he would not have agreed to draw a will, without talking to Mrs. McCafferty, leaving Mrs. Slattery a reasonable share of the estate, nor would he have been willing to draw a will leaving Mrs. Slattery whatever Mrs. McCafferty told him she wished her to have.

Mrs. Rutledge, the night sitter, testified to a conversation with Mrs. Slattery in which the latter said she had to hurry as she wished to put words about the will in Aunt Min's mouth. This statement Mrs. Slattery emphatically denied. Two witnesses testified that after Mrs. McCafferty's death Mrs. Slattery said that "Aunt Min was crazier than a pet coon" and "nuttier than a fruit cake". Mrs. Slattery vehemently denied making those or any similar statements.

To Summarize: Delevan McCafferty, stepson of the testatrix, failed to prove facts which were sufficient—either as a matter of law or as a matter of fact—to establish confidential relationship, and utterly failed to prove mental incapacity or undue influence. If the jury had returned a verdict for the stepson upon the evidence produced by him in this case, the Chancellor would have had to set it aside.

The Chancellor granted the defendant a new trial because he believed he erred in affirming plaintiff's eighth point for charge which was taken (with unimportant changes) verbatim from *Hollinger Will,* 351 Pa. 364, 367, 41 A. 2d 554, 555. While the Hollinger Will says: "all of these constituted an influence in the making of her will", it was an inadvertent statement because it clearly means "any or all" and the Chancellor in the other parts of the charge clearly showed that he meant "any or all". It was, under all the facts and circumstances, a harmless error.

The Chancellor did not decide whether the verdict of the jury was against the weight of the evidence, but, as above pointed out, the evidence offered by defendant was inadequate to support a jury's verdict. The grant of a new trial was a manifest abuse of discretion which this Court has power to correct: Cf. *Williams v. McCarroll,* 374 Pa., supra; *Dible's Estate,* 316 Pa. 553, 175 A. 538; *Doster's Estate,* 271 Pa. 68, 113 A. 831; *Mark's*

*Estate,* 298 Pa. 285, 148 A. 297; *Fink's Estate,* 310 Pa. 453, 165 A. 832; *Millenson v. City Stores Co.,* 382 Pa. 39, 114 A. 2d 80; *Decker v. Kulesza,* 369 Pa. 259, 85 A. 2d 413.

The order of the Court below dismissing motion of defendant, Delevan A. McCafferty, for judgment non obstante veredicto is affirmed; the order of the Court below granting motion of defendant, Delevan A. Mc-Cafferty, for a new trial is reversed. The record is remanded to the Court below with directions to enter a judgment upon the respective verdicts and for such other action as may be proper or necessary in accordance with this opinion. Costs shall be paid by Delevan McCafferty.