Farmer Will.

Argued May 1, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*David H. Kubert,* with him *J. Franklin Hartzel, M. Stuart Goldin* and *Levi, Mandell & Miller,* for appellants.

*J. Lawrence Grim,* for appellee.

OPINION BY MR. JUSTICE ARNOLD, June 25, 1956:

In this will contest, tried without a jury, the contestants appeal from the refusal of their petition for an issue devisavit vel non and dismissal of their appeal from probate of decedent's will. They alleged as basis for contest: (1) forgery; and (2) undue influence practiced by proponent upon decedent, who was alleged to be so infirm and of such advanced years as not to comprehend the meaning of a will; and further alleged that proponent occupied a position of confidential relationship with decedent. The charge of forgery was abandoned, there being no testimony offered in that regard.

The court below found that no mental infirmity existed; that undue influence was not established; that there was no substantial dispute of fact; and refused an issue devisavit vel non. We have repeatedly declared that " 'the chancellor's decision will not be reversed unless an abuse of discretion on his part appears' ": *Williams v. McCarroll,* 374 Pa. 281, 299, 97 A. 2d 14. See also *Pusey's Estate,* 321 Pa. 248, 184 A. 844. So viewed, the decree in this case must be affirmed.

Proponent, decedent's nephew, is sole beneficiary under decedent's will. The estate consists of a small amount of personalty, and real estate (decedent's

homestead) valued at approximately $25,000. The original contestants were a nephew, niece, and sister of decedent. The sister having since died, contestant Delago, her husband, was substituted as personal representative. The will was executed on October 18, 1949, at which time decedent also executed a deed conveying the realty to proponent.

Proponent introduced the will, as probated, and then rested. The only testimony offered in contest was that of contestants who called as witnesses the proponent (as on cross examination); decedent's physician; contestants themselves; and the mother of two of the contestants (the nephew and niece).

" 'No right of a citizen is more valued than the power to dispose of his property by will. . . His. . . last and final direction should not be struck down except for the clearest reason' ": Wetzel v. Edwards, 340 Pa. 121, 128, 16 A. 2d 441. Thus " 'where a will has been properly executed in every particular, a presumption of testamentary capacity and lack of undue influence arises, [requiring] compellng evidence to upset the will, since the law favors its validity . . .' ": Cressman Estate, 346 Pa. 400, 404, 31 A. 2d 109. The testimony, as will be readily noted, did not meet this test.

Proponent testified that from September 3, 1949, to December 5, 1950, decedent stayed at his home for half of that period, paying no rent or board; that when decedent was in her own home he visited her every other day "to see how she was and get in food and things like that"; except for colds she was in good health until she suffered a collapse and was hospitalized on December 5, 1950; thereafter she resided in convalescent homes until her death; during this period he entrusted to her custody his minor children for trips into the city; that he transacted no business

for her, but did drive her to a post office once a month to cash checks [money orders?]; and that on April 7, 1952, on his petition a guardian for her estate was appointed. He testified further that she had never discussed nor mentioned a will or transfer of property until October 18, 1949. On that date, at her request, he drove her to her attorney's office, where she directed transfer of the realty and preparation of the will, both of which she then executed. He denied any confidential relationship; and denied knowing or contacting the attorney who performed the services for decedent.

Dr. Kressley, decedent's physician, testified that he had treated decedent in January, 1934, for injuries suffered in an accident, which injuries had no effect on her mind; that he next treated her on December 5, 1950, for a vascular and heart collapse, which was "sudden"; that she was suffering mental and physical impairment on that date, but he could not declare whether it had existed prior thereto.

Contestant DeLago testified that about September 7, 1949, he and his wife had gone to proponent's home, and after they had greeted decedent the proponent said something to her, whereupon she went "upstairs" and remained; that proponent gave as an excuse for her actions that she did "not feel so good"; that they again visited proponent's home a week later, and were told that decedent was "upstairs" and did not want to talk to anyone; that they returned in November, 1949, when decedent was absent, and were told by proponent's wife that "it [was] . . . impossible for [her] . . . to keep [decedent]. . . She can't control her bowels."

Decedent's sister-in-law stated that decedent "was never talkative," was "very quiet," had "very little to say"; that during the year 1948 to 1949 "she didn't seem just fit to pay the bills or anything of that sort,

because when I was up there Florence [the unmarried sister] would say that she was going to go down to Philadelphia and pay the electric bill"; that when she saw decedent in November, 1949, "she seemed to be failing very fast. . . wasn't as lively as she had been previously. . . seemed more feeble than she had been . . . repeated herself . . . [and] seemed to talk slower."

The contestant nephew declared that he saw decedent about September, 1949, at which time she weighed about 100 pounds, was "slowing down" and "was feeble"; that in 1948 she had been active, was "very quick walking," and weighed 115 to 120 pounds; and that he saw her again a few days later, but made no observations.

The contestant niece testified that she had visited decedent some 12 times in 1949; that by September 2, 1949, she "had become very thin . . . was very drawn, had a very jagged look," although she volunteered that decedent had always been "very white looking"; that in conversation decedent's answers "had no reference" to the conversation; that she visited decedent in November, 1949, at which time "she was not a feeble-minded person . . . but was very feeble in her movements," but that decedent told her she "felt all right and was capable of taking care of herself"; and that when she saw decedent in January, 1951, she "looked to be in a complete mental collapse."

This is substantially all of the testimony upon which contestants base their case. But these, and many more severe deflections from the normal, have been repeatedly declared to be wholly insufficient to rebut the presumption of testamentary capacity and lack of undue influence: *Rupert Will,* 349 Pa. 58, 36 A. 2d 500; *Ash Will,* 351 Pa. 317, 41 A. 2d 620; *Higbee Will,* 365 Pa. 381, 75 A. 2d 599; *Roberts Will,* 373 Pa. 7, 94 A. 2d 780. "Neither old age, nor its infirmities, in-

cluding untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of the right to dispose of his own property": *Higbee Will,* 365 Pa. 381, 384, 75 A. 2d 599.

It is to be noted that proponent's testimony—that this will was prepared by decedent's attorney at her request in accordance with her directions and without interference by him—was uncontradicted. These facts, in themselves, afford an inference that the will was properly made by a person having testamentary capacity and free of undue influence: *Williams v. Mc-Carroll,* 374 Pa. 281, 97 A. 2d 14; *Ross Will,* 355 Pa. 112, 49 A. 2d 392. Nor did the adjudication of incompetency, subsequent to execution, nullify the will or establish lack of testamentary capacity: *Higbee Will,* 365 Pa. 381, 386, 75 A. 2d 599.

Contestants failed to establish the existence of a confidential relationship. We held in *Llewellyn's Estate,* 296 Pa. 74, 145 A. 810, that the fact that proponent drew checks, paid bills, and slept in the same room with decedent to take care of him, did not establish a confidential relationship. These contestants' proof is far less. Mere kinship certainly does not establish the relation, and her dependency on him, which was slight, did not "necessarily beget a confidential relation, indeed, it may be quite the reverse": *Leedom v. Palmer,* 274 Pa. 22, 26, 117 A. 410. See also *Citizens National Bank v. McCafferty,* 383 Pa. 588, 119 A. 2d 297.

Nor was there proof of undue influence. To set aside the will on this ground there must be "imprisonment of the body or mind, fraud, threats, misrepresentation, circumvention, inordinate flattery, or physcal or moral coercion" which destroys decedent's free agency and operates as a present restraint: *May v. Fidelity Trust Company,* 375 Pa. 135, 144, 145, 99 A. 2d 880. Mere opinions or suspicions unfounded in fact are not suf-

ficient to establish undue influence: *Hook's Estate,* 207 Pa. 203, 205, 56 A. 428. Taking as true all of contestants' testimony as to decedent's mental and physical condition, coupled with all of proponent's actions, their case was still wholly insufficent to prove undue influence. Cf. *Citizens National Bank v. McCafferty,* 383 Pa. 588, 119 A. 2d 297.

What we said in *Johnson Will,* 370 Pa. 125, 130, 87 A. 2d 188, is particularly applicable: " 'Not only was there no abuse of discretion by the [hearing judge], but the facts and circumstances adduced by contestant were so [unconvincing] that it would have been a . . . miscarriage of justice to hold that contestant's evidence raised a substantial or material dispute of fact, which is requisite for the granting of an issue.' " Contestants' claim that proponent failed to meet the burden of going forward with the evidence is untenable—he had nothing to meet or overcome.

Decree affirmed; costs to be paid by the estate.