Masciantonio Will.

Argued January 12, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and McBRIDE, JJ.

and opinions filed April 20, 1959.

18

*Walter E. Alessandroni*, with him *Francis T. Dennis*, for appellants.

*James R. Caiola*, with him *Richard S. Lowe*, and *DiGiacomo and Lowe*, for appellees.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, May 8, 1959:

For the second time we are called upon to determine questions arising out of an attack on the validity of this will. On the first appeal (*Masciantonio Will*, 392 Pa. 362, 141 A. 2d 362) we reversed the Orphans' Court of Montgomery County and directed "that the court below review the entire record in a manner consistent with [our] opinion with special reference to the relative weight to be accorded the testimony of the two physicians who attended the decedent during his last illness or, in the alternative, that the court exercise its discretion by directing a jury's determination of the issue of testamentary capacity under proper instructions in keeping with [our] opinion upon a retrial; . . . ." The court below, upon the return of the record from this Court, once again upheld the validity of the will, found that the decedent at the time of execution of the will did possess testamentary capacity and dismissed the appeal from the probate of the will. These appeals from that decree were then taken.

The facts and circumstances surrounding the execution of this will are fully set forth in our previous opinion and need not be repeated herein.

In the court below at the outset of this will contest the parties failed to demand a trial by jury and waived thereby their right to such trial in the event the court found that a substantial dispute of fact existed concerning the validity of the will; §745(a), (c), of the

Orphans' Court Act of 1951,[1] as amended. Despite this waiver of the right to a jury trial the court below had the right in its discretion to require a trial by jury of any of the issues of fact: §745(d) of the Orphans' Court Act of 1951, as amended, supra. The court below did not sit to determine preliminarily whether or not there existed such a substantial dispute of fact on the issue of decedent's testamentary capacity so as to justify a trial by jury as a matter of right, but rather as the ultimate fact-finding tribunal.[2]

In considering this case a second time on appeal we do not alter that which we said in *Masciantonio Will*, 392 Pa. 362, 367, supra: "In reviewing this decree of the court below we are mindful that the findings of an Orphans' Court judge, who heard the testimony without a jury, are entitled to the weight of a jury's verdict and are controlling upon us and that its decree should not be reversed unless it appears that the court has abused its discretion: Williams v. McCarroll, 374 Pa. 281, 298, 97 A. 2d 14. See also: Kerr v. O'Donovan, 389 Pa. 614, 629, 134 A. 2d 213; Farmer Will, 385 Pa. 486, 487, 123 A. 2d 630. However, we are also mindful that if it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence the court's findings may be set aside: Mohler's Estate, 343 Pa. 299, 305, 22 A. 2d 680. The test is not whether we, the appellate court, would have reached the same

---

[1] Act of Aug. 10, 1951, P. L. 1163, art. VII, as amended, Feb. 10, 1956, P. L. (1955), 1022, §5, 20 PS §2080.745.

[2] That there is a distinction between a court determining the propriety of the grant of an issue and acting as the ultimate fact-finding tribunal, see: *Kerr v. O'Donovan*, 389 Pa. 614, 621, 622, 134 A. 2d 213; *Lewis Will*, 364 Pa. 225, 232, 72 A. 2d 80; *Lare Will*, 352 Pa. 323, 331, 332, 42 A. 2d 801; *DeLaurentiis's Estate*, 323 Pa. 70, 79, 80, 186 A. 359; *Kline's Estate*, 322 Pa. 374, 378, 186 A. 364.

result had we been acting as the hearing judge who saw and heard the witness, 'but rather whether a judicial mind, on due consideration of the evidence, as a whole, could reasonably have reached the conclusion of the chancellor': Shuey et al., Exrs. v. Shuey et al., 340 Pa. 27, 32, 16 A. 2d 4." Such rules of appellate review, however, do "not mean that he [the trial judge sitting as a chancellor] is a law unto himself and that the workings of his conscience cannot be reviewed. On the contrary, the authorities are clear to the effect that his discretion in such cases is,—as in all other cases—not unlimited, and that his decision should be reversed in this court, if, in our opinion, the discretion has been abused; [citing cases]"; STERN, J. (later Chief Justice) dissenting in *May v. Fidelity Trust Company,* 375 Pa. 135, 150, 99 A. 2d 880. Were it otherwise appellate review would be futile and vain.

In all appeals from decrees of Orphans' Courts we are under the statutory duty to "hear, try and determine the same as to right and justice may belong, and decree according to the equity thereof": Orphans' Court Act of 1951, supra, §773, 20 PS §2080.773; *Ciammaichella. Appeal,* 369 Pa. 278, 281, 85 A. 2d 406; *Nimlet's Estate,* 299 Pa. 359, 368, 149 A. 658; *McCullough's Estate (No. 2),* 292 Pa. 422, 426, 141 A. 239; *Shelley's Estate,* 288 Pa. 11, 15, 135 A. 740; *Drennan's Estate,* 118 Pa. 176, 12 A. 348.

Even the most cursory examination of the opinion of the court below reveals the rendition by it of simply lip service to the mandate of this Court, a mere profession of obedience. It is not for this Court to act as a fact-finding tribunal nor to substitute its judgment for that of the trial judge who saw and heard the witnesses. It is, however, exclusively within our province to determine whether a subordinate court has complied with a considered mandate of this Court. *We have not*

*determined in our previous opinion nor do we now determine with respect to the validity of this will or the presence or lack of testamentary capacity in the decedent on July 20, 1955.* We consider only whether the court below in determining those issues has followed the order of this Court as to the manner of reviewing the evidence. An examination of the opinion of the court below in which it purports to review the evidence reveals unerringly that it failed to review the evidence as a whole and with that sense of impartiality and objectivity implicit both in our mandate and the opinion setting forth the reasons for such mandate. In view of our mandate, we find obvious both a perfunctory review of the evidence and an abuse of discretion on the part of the court below.

Even though we did not have the opportunity of seeing and hearing the witnesses, the testimony as it appears in the record reveals no such "inadequacies and weaknesses" in the contestants' proofs as to justify the court's making a finding to this effect.[3] Both the proponents' and contestants' proofs were of such quality that had an issue *devisavit vel non* been requested it would have had to be allowed. While the law, for very practical reasons, places extensive power in the hands of a chancellor in a will contest, such power must be exercised with discretion and objectivity.

Patently, the court below did not follow the mandate of this Court. Under such circumstances justice and equity require that the determination of the issue of decedent's testamentary capacity be reposed in other hands, and we have no other recourse than to direct the trial of such issue by a jury.

------

[3] Implicit in our former opinion was a finding that, *if properly evaluated,* contestants' proofs were substantial. Despite this, the court below rejected the opinion of this Court in that respect

22

It is, therefore, our opinion that the issue of testamentary capacity should be tried by a jury.

Decree reversed with the direction that a trial by jury be had to determine the testamentary capacity of Ermindo Masciantonio at the time of the execution of the will of July 20, 1955.

---

DISSENTING OPINION BY MR. JUSTICE BELL:

This is a will contest involving the question of whether the testator possessed or lacked testamentary capacity at the time he made his will on July 20, 1955, at approximately 4 p.m. The parties waived a jury trial and the Orphans' Court Judge sat as jury and Judge. At the first trial, the hearing Judge sustained the validity of the will. On appeal this Court reversed and directed "that the court below review the entire record in a manner consistent with [our] opinion with special reference to the relative weight to be accorded the testimony of the two physicians who attended the decedent in his last illness . . . ." (*Masciantonio Will*, 392 Pa. 362, 141 A. 2d 362).

President Judge TAXIS, the hearing Judge, carefully and fully complied with the mandate of this Court and in an opinion of 25 printed pages analyzed the testimony of the important witnesses for and against the will, and sustained the will. With the possible exception of one sentence to which I will hereinafter refer, Judge TAXIS's opinion was an exceptionally able one; and since the validity or invalidity of the will depended almost entirely on the credibility of Bernard DiGiacomo (the lawyer who drew the will and who was corroborated in almost every detail), and since the hearing Judge believed DiGiacomo—DiGiacomo's credibility was a question which only the hearing Judge and

no member of this Court could decide—it is clear that the Decree should be affirmed.

Ermindo Masciantonio was married in 1904. He came to the United States from Italy in 1905. He left his wife in Italy nine months after their marriage and never saw her again, although she would have us believe he was so much in love with her that he tried for 50 years to bring her to this Country. He lived for a period of *24 years* (from 1918 to 1942) in Conshohocken with *a niece, Antoinette* D'Allesandro* and her family, consisting of her husband and four children. *Antoinette's four children* are the devisees of his four pieces of real estate in Conshohocken.

Masciantonio did not will his estate to his wife whom he loved so much that he hadn't seen her in 50 years and whom he specifically disinherited, or to any of his nephews and nieces in Italy whom he had never seen; he left his property in his will to his four grand-nephews and grand-nieces with whom he had lived for 24 years, and to the Church, and to Rose Benedict, his first cousin once removed. This was certainly a natural will.

Masciantonio's wife unwisely failed to take against the will. Instead, she and his nine nephews and nieces who live in Italy, contested the will on the ground that testator lacked testamentary capacity. If they are successful, none of his grand-nephews and grand-nieces with whom he lived in Conshohocken for 24 years, or Rose Benedict or his Church will receive anything.

Proponents produced ten witnesses, the most important of whom were Bernard DiGiacomo, the attorney who drew and witnessed the will, and Rose Masciantonio Benedict, a subscribing witness and residuary legatee.

---

* She died in 1937.

Masciantonio, having been advised by a priest on July 19th to get a lawyer to make his will,* sent for DiGiacomo. Everyone knows that a priest would not have advised Masciantonio to get a lawyer to draw his will if Masciantonio had been in the stuporous mental condition described by Dr. Rappaport. On July 19th and again on July 20th, Masciantonio told DiGiacomo *in detail*—in the course of numerous questions and answers—exactly what he wanted in his will; what each person and the Church was to receive; and he told DiGiacomo the address of each house which he owned and the relative to whom he wished to give it. DiGiacomo knew Rose Masciantonio Benedict very slightly; he did not know testator's devisees, or who were the testator's relatives or their names, or what real or personal property he had; so that it would have been impossible for him to have fabricated such a will unless the testator or Rose Benedict gave him the information. DiGiacomo testified that testator gave him all the detailed directions about the gifts and provisions he wanted to make in his will, and the person to whom he wanted to give each of his properties; and that no one prompted the testator or made any suggestions to him. The hearing Judge, sitting as Judge and Jury, believed DiGiacomo, and Rose Benedict, who corroborated him.**

We quote the following excerpts from the opinion of the hearing Judge: "In compliance with the decree of the Supreme Court of April 21, 1958, and in obedience to its mandate, the entire record of this case has been carefully reviewed '. . . with special reference to the relative weight to be accorded the testimony of the

---

* The priest said to Masciantonio: "You should make a will, regardless of how you make it or to whom you leave it. . . . you should get . . . someone to call in a lawyer to make a will."

** He was also corroborated by at least two other witnesses.

two physicians who attended the decedent during his last illness . . .'.

"After full and careful consideration and review of the entire matter I am convinced and so find as a fact, that this testator possessed testamentary capacity at the time his will was executed on July 20, 1955."

The Judge then analyzed the testimony of Dr. Rappaport, the principal witness for the contestants, who saw decedent once or twice a day from July 10th to July 20th. On July 20th at 11 o'clock in the morning, he examined decedent for 10 minutes and for 5 minutes at 5 o'clock in the afternoon. He testified that from his observation, Masciantonio did not have mental capacity to be of sound mind, and was not in condition to give the information to DiGiacomo which DiGiacomo said he did; that Masciantonio was stuporous and toxic all the time, and "could not execute that kind of a will the first day he came into the hospital [July 10th] or during his entire confinement in the hospital."

". . . The probative weight of Dr. Rappaport's testimony is shattered by the following testimony:

"1. *Dr. Carfagno's testimony** that at the time of his examination of the decedent on July 17th, he was responsive and that Dr. Carfagno had little difficulty in extracting a medical history from the patient.*

. . "2. *The array of testimony by proponents and some of contestants' witnesses concerning conversations with decedent during the course of this hospitalization.***

"3. Dr. Rappaport's own notation on the hospital chart that clinically the patient was better and would 'go home Saturday.'

---

\* Dr. Carfagno was the only other important witness for contestants.

\*\* Italics throughout, ours.

"As a fact-finder, I conclude that during the entire course of his examination Dr. Rappaport did not have a clear concept of the term testamentary capacity.

"*The weaknesses, the contradictions, the inconsistencies, and the conflicts in Dr. Rappaport's testimony* leads me to conclude that this type of equivocal, vascillating and doubtful testimony most certainly is not the strong, clear and compelling evidence required to establish testamentary incapacity. Viewing the nature of the testimony of Dr. Rappaport 'exactly the same' as the testimony of the subscribing witnesses, Dr. Rappaport's testimony lacks the probative weight required by law upon which to base a finding of testamentary incapacity. *I have no abiding confidence in his testimony which bears on the main issue of testamentary capacity.*

"Dr. Carfagno's testimony differed significantly from that of Dr. Rappaport. It contained no self-contradictions, contained much less detail, and his general demeanor and mode of testifying were convincing. However, the opportunity which Dr. Carfagno had for observing the decedent was extremely limited ["five perhaps ten minutes on July 20th"] and when analyzed in detail it is apparent that his testimony, like that of Dr. Rappaport, does not constitute strong, clear and compelling evidence of lack of testamentary capacity."

When Dr. Carfagno saw Masciantonio on July 20th "he imagined" sometime between 1:15 and 2 o'clock p.m. for "five perhaps ten minutes", Masciantonio was either asleep or lethargic and Dr. Carfagno did not wake him. Dr. Carfagno testified with respect to Masciantonio's mental powers: "These are *impressions* that a physician gets. . . . From the observations I made *on the 20th* it would be my *impression* that he would not be able to [dispose of his property and sign the will as he is alleged to have done] . . . . As I said previously,

I did not receive any answers from the patient [when I saw him on the 20th of July]. This was an *impression*. . . . I did not directly ask the patient or receive any answers from him which would enable me to say whether or not he could understand this last will and testament. I have the *impression* from his overall clinical picture that he would not be able to. . . ."

"The foregoing review of the testimony of Dr. Rappaport and Dr. Carfagno as set out highlights certain basic and fundamental weaknesses, contradictions, inconsistencies, and conflicts in the medical testimony which a trier of fact cannot ignore when passing upon the probative weight to be ascribed thereto.

"1. *The testimony of Dr. Rappaport in important particulars is directly contradicted by proponents' witnesses and by witnesses for contestants.*

"2. *The testimony of Dr. Rappaport not only is contradictory in some phases but also is contradicted by some of the testimony of Dr. Carfagno.* [Particularly as to Masciantonio's condition on July 17th.]"

The hearing Judge, after having considered every possible interest which each witness might have, then quoted and analyzed the testimony of DiGiacomo at very great length. We quote an additional excerpt from his Opinion:

" '[by DiGiacomo] A. . . . there never was, in my mind, any doubt whatsoever, that this man fully realized what he was doing, and fully appreciated the fact to whom he was leaving the property. There was never the slightest doubt—I took all precautions which I know in engaging him in conversation and making sure his answers were responsive, and going over with him, not only once, as on the 19th, but, also, again, on the 20th . . . I did not know at that time—the decedent, the fact that he owned this property which it eventually turned out that he did own, or anyone of the de-

visees of the will who were not in that room. I only know Rose Benedict, I would say, prior to that time a ten minutes' talking in all the years that I knew her.'

"The credibility of Mr. DiGiacomo was given careful consideration initially and the record was re-examined with particular attention to this factor. Having again reviewed the record and in light of my recollection of the demeanor of the witness and his mode of testifying at the time of the hearing I again conclude that the *testimony of Mr. DiGiacomo is worthy of belief and credible and eminently establishes beyond any doubt the fact that on July 20, 1955, when this testator executed his will he possessed testamentary capacity.*"

DiGiacomo testified clearly, directly and *in great detail* as to the *factual* statements which Masciantonio made to him on July 20th (and also on July 19th) about the disposition of his property—for example, Masciantonio told him he wished to give each of his houses to a particular nephew or niece, giving the address of each house and the name of the nephew or niece to whom he wished to give the property. He likewise testified that Masciantonio told him he wanted to give $3,000 to the Church, and the rest of his money to Rose Masciantonio Benedict, and he wanted to disinherit his wife. Either DiGiacomo's testimony was a truthful statement of the detailed directions which Masciantonio gave him on July 19th and July 20th as to the exact disposition he wanted to make of his property and each of his houses, as the Judge who saw and heard him believed, or his testimony was a tissue of lies. On the other hand, Dr. Rappaport and Dr. Carfagno merely gave *their opinion or impression* (Carfagno) that Masciantonio, because of his stuporous condition, could not have had the discussion about his will on July 20th at 4 o'clock p.m., to which DiGiacomo

testified—and this *"opinion or impression"* was either correct or mistaken.

Medicine is not a mathematical science, and nearly every adult person knows and every doctor well knows that on some or many occasions he has been mistaken in his medical opinion, whether it be diagnosis or prognosis, even though it was honestly given. In other words, Dr. Rappaport and Dr. Carfagno could each have been giving his honest opinion of what he believed Masciantonio would have been able to do when they were not present on July 20th, and yet Masciantonio could have told DiGiacomo exactly what he wanted done with his property, as set forth *in detail* in his will. If DiGiacomo's testimony was believed by the hearing Judge sitting as the jury and the Judge, it is *indisputable* that Masciantonio had testamentary capacity, as the hearing Judge found, and Masciantonio's will must be sustained.

The majority opinion says "We are mindful that the findings of an orphans' court judge who heard the testimony without a jury are entitled to the weight of a jury's verdict and are controlling upon us and that its decree should not be reversed unless it appears that the court has abused its discretion: Williams v. McCarroll, 374 Pa. 281, 298, 97 A. 2d 14. . . . Even the most cursory examination of the opinion of the court below reveals the rendition by it of simply lip service to the mandate of this court. . . . We find obvious both a perfunctory review of the evidence and an abuse of discretion on the part of the court below."

I believe the majority opinion has put the shoe on the wrong foot. The majority have, in my judgment, made only a perfunctory review of the evidence and its opinion merely pays lip service to the Rule, which it then completely disregards. I do not see how it is possible for anyone to say that the very able opinion

30

of the hearing Judge, which reviews at great length and carefully and thoroughly analyzes the important testimony of the important witnesses,* was "perfunctory".

The majority then make an extraordinary Order—having authorized the hearing Judge or Chancellor to try the case without a jury, they now order a jury trial because "the testimony *as it appears in the record* reveals no such 'inadequacies and weaknesses' in the contestants' proofs as to justify the court's making a finding to this effect. [The Chancellor's finding was undoubtedly justified, but it was superfluous and entirely unnecessary.] Both the proponents' and contestants' proofs were of such quality that had an issue devisavit vel non been requested it would have had to be allowed." The majority's first statement (a) cannot be supported by the record, and (b) is irrelevant, and the second statement as to an issue d.v.n. is likewise irrelevant.

I shall consider the aforesaid statements in their inverse order. The test of whether an issue devisavit vel non should be granted is well settled: Did the evidence raise " 'a substantial or material dispute of fact, . . . The chancellor's refusal of an issue devisavit vel non will not be reversed by an appellate court unless there was an abuse of discretion: [citing cases]' ": *Johnson Will*, 370 Pa. 125, 130, 87 A. 2d 188. See also: *Kerr v. O'Donovan*, 389 Pa. 614, 134 A. 2d 213; *Farmer Will*, 385 Pa. 486, 123 A. 2d 630; and *Williams v. McCarroll*, 374 Pa. 281, 299, 97 A. 2d 14, and cases cited therein.

The majority opinion relies upon this well established rule but signally fails to note that it applies *only* where a Chancellor grants a judgment n.o.v., or an issue d.v.n. is refused, or the trial Court refuses

---

* In 25 printed pages.

to submit the issue to the jury: See cases supra. This rule is *inapplicable* to the present case which is strikingly different. In this case the *Jury* found, from the overwhelming weight of the credible evidence that testator had testamentary capacity and these findings were likewise made or *affirmed* by the hearing Judge who saw and heard all the witnesses. In such a case the law is clearly settled, as stated by Mr. Justice STEARNE in *Roberts Will*, 373 Pa. 7, 94 A. 2d 780 (pages 9-10):

". . . [Where] 'The jury's verdict satisfies the professional and judicial conscience of the trial judge, is fully compatible with the evidence and the law of the case, . . . [it] must therefore be upheld by the court.'

"The scope of a review by an appellate court under such circumstances is well defined in Stewart Will, 354 Pa. 288, 47 A. 2d 204. In that case Mr. Justice JONES said, p. 295: 'Once the chancellor approves and accepts the verdict, *it becomes binding in the will contest in the Orphans' Court as determinative of the fact so established*: Cross's Estate, 278 Pa. 170, 184, 122 A. 267. . . .' "

The test of review by an appellate Court is to ". . . review the testimony in order *to ascertain whether or not it sufficiently supports the verdict* and the chancellor's approval of the same."\*

It is clear, therefore, (1) that the majority have adopted an *inapplicable* test in considering the findings of fact which were made by the jury and affirmed by the hearing Judge; and (2) it is impossible for us, who never saw or heard any of the witnesses, to hold that there was no credible evidence to sufficiently support

---

\* The only other test prescribed for an appellate Court in such a case is found in *Mohler's Estate*, 343 Pa. 299, 305, 22 A. 2d 680, where the Court said we could reverse "if it appears from the record that there is a capricious disbelief of evidence . . ."

the verdict of the jury and the Chancellor's approval of the same.

That brings us to the principal if not the sole reason on which the majority relied in order to reverse the decree of the Chancellor: "The testimony as it appears *in the record* reveals no such 'inadequacies and weaknesses' in the contestants' proofs as to justify the court's making a finding to this effect." This finding was undoubtedly correct but was, we repeat, superfluous and entirely unnecessary for the decision. But even more important, there are two fallacies in the majority's statement or position. First and most important, the majority once again has applied the wrong test. The test in this case is not restricted to the testimony *as it appears in the record;* the test is "the testimony in the record considered in the light of the credibility of the witnesses." It must be obvious that in this case we are in no position to determine credibility, or to overrule the jury's and the hearing Judge's findings of credibility.

Moreover, even if we confine ourselves to the testimony set forth in the record it reveals such tremendous strength in the proponents' case and such "inadequacies and weaknesses in the contestants' case" as to amply justify the Chancellor's findings and conclusion on this point. While I have hereinbefore analyzed and reviewed the inadequacies and weaknesses in the contestants' case, I wish to repeat that (a) Dr. Carfagno's opinion was merely "an impression" after a five or ten minute observation of Masciantonio on July 20th,* and was unquestionable *legally* weak; and (b) Dr. Rappaport's testimony was filled with inconsistencies, weaknesses, contradictions and conflicts with numerous

---

* Dr. Carfagno also saw Masciantonio on July 17th when he was responsive to questions, gave the Doctor a detailed statement about himself, and did not show any difficulty in expressing himself.

witnesses (including Dr. Carfagno) as the opinion of the hearing Judge points out, and as I pointed out in my 25 page dissenting opinion in *Masciantonio Estate*, 392 Pa. 362, 389, and as a study of the record will strikingly emphasize. Moreover, the hearing Judge stated that *he had no confidence* in Dr. Rappaport's testimony on the main issue of testamentary capacity. In view of the finding by the jury and by the hearing Judge of lack of credibility in contestants' principal witness, it is impossible for me to understand how an appellate Court can find a lack of evidence to support the jury's verdict or even a manifest abuse of discretion when the jury's findings, buttressed by the Chancellor's affirmation or findings, are based not only upon the *obvious* weakness and conflicts in contestants' evidence, as hereinabove mentioned, but even more important, upon (a) *the lack of credibility* of contestants' principal witness, and (b) the strength and credibility of proponents' principal witnesses.

If the jury and the hearing Judge believed, as they did, the testimony of DiGiacomo* it is certainly clear that the overwhelming weight of the evidence was in favor of testamentary capacity and beyond the peradventure of a doubt supports the findings of the jury and of the hearing Judge. In view of this evidence and these findings, it is incomprehensible to me how it can be said that the hearing Judge's affirmation of the jury's verdict was a manifest abuse of discretion unless the Court ignores the evidence, and the findings of the jury as to credibility, and all the prior decisions of this Court. In other words, where the testimony of DiGiacomo—as to the detailed instructions decedent gave him for his will—is clear, positive and direct, and not evasive or contradictory, and is not contradicted or inherently incredible, neither I nor any member of an

---

* And other witnesses of proponents.

34

appellate Court is in a position to say that his testimony was false, or that it was a manifest abuse of discretion or a capricious disregard of the evidence for a jury and a hearing Judge to believe DiGiacomo and proponents' witnesses and disbelieve Dr. Rappaport. Yet, no matter how they attempt to disguise it, that is exactly the position taken by the majority in this case.

I am convinced that the majority's decision is another example of the new meaning which is given to the long established Rule which states that an appellate Court will only reverse a hearing Judge or Chancellor for an abuse or a manifest abuse of discretion. I am convinced that the Rule now means this: Any finding or conclusion or decision made by a hearing Judge or a Chancellor or a trial Judge—*even if it is based wholly or in substantial part on the credibility of the witnesses* whom he saw and heard and we did not—constitutes a manifest palpable abuse of discretion, if it differs from what we would have reached. Of course I very strongly oppose and disagree with such a test, or with any other test which changes or overrules the interpretation or meaning which a host of prior decisions of this Court had established.

I would affirm the Decree.