**Adams Estate**

*Paul P. Wisler, J. Edmund Mullin,* and *Rosemary M. Flannery,* for proponents.

*Henry T. Crocker,* for contestants.

TAXIS, P. J., July 9, 1971.—H. Marian Adams, testatrix, died on May 17, 1970. She was survived by her two daughters, Phyllis M. Davis and Lois M. Bailey, who are her next of kin and the contestants in this appeal. On June 11, 1970, the register of wills probated a certain writing dated September 16, 1969, as testatrix' last will. This document contained a number of specific gifts, but gives the entire residuary estate to

Gordon E. Shanabrook and June S. Shanabrook, his wife, or their survivor, absolutely.

This appeal alleges, in substance, that testatrix lacked testamentary capacity when the writing was executed, that it was procured by the undue influence of Gordon E. Shanabrook, and that Gordon E. Shanabrook practiced fraud on testatrix by withholding facts concerning his character and motives from her when she was physically and mentally infirm. However, the allegation of fraud has been withdrawn.

Testatrix had executed a prior will on August 16, 1969, by which she left $500 to Gordon E. Shanabrook, whom she identified as her insurance agent and financial adviser; her four grandchildren were the residuary beneficiaries. Gordon E. Shanabrook and June S. Shanabrook were the subscribing witnesses to that will, but the writing now before us was witnessed by two of Mr. Shanabrook's business associates, Harold Moyer and Leonard Sherman. Extensive hearings were held on the appeal on January 5, 6 and February 10, 1971. It has now been argued and helpful briefs submitted.

We shall consider the grounds urged by contestants in the order in which they were raised. Testamentary capacity is required by the Wills Act of April 24, 1947, P. L. 89, sec. 1, 20 PS §180.1, by the statement that, "Any person of sound mind . . . " may make a will. In general, the presence or absence of such capacity must be determined as of the time of the execution of the will, and the state of a testator's mind at other times becomes correspondingly less important, the further removed it is from the crucial moment. See Phillips's Estate, 299 Pa. 415. Testamentary capacity is not necessarily governed by the competence or incompetence of a testator for other purposes; it requires only that he have knowledge of the property he possesses, the disposition he desires to make of it and the persons or objects he desires to receive his

bounty: Williams v. McCarroll, 374 Pa. 281. In the absence of fraud or undue influence, no great share of reason is necessary: Snyder's Estate, 279 Pa. 63. See Aker, Probate and Interpretation of Wills, pages 48-9.

Some other well-established rules must be kept in mind as well. Medical testimony by physicians who observed a testator shortly before or shortly after the execution of the will is entitled to as much weight as that of nonexperts, including a scrivener, who are actually present during execution of the will: Masciantonio Will, 392 Pa. 362, 396 Pa. 16. Further, neither advancing age nor physical weakness or illness alone will deprive a testator of testamentary capacity; there must be an impairment of the mental faculties, sometimes called "profound general mental incapacity": Dichter Will, 354 Pa. 444; Kredatus Will, 19 Fiduc. Rep. 421. And finally, a heavy burden of proof is imposed upon contestants, since proof of testamentary incapacity must be by clear, strong and compelling evidence, especially when competency has been testified to by the scrivener, subscribing witnesses and the attending physician: Franz Will, 368 Pa. 618, 622.

Preliminarily, proponents properly proved the execution of the document by the testimony of the two subscribing witnesses. These persons had been asked by Gordon E. Shanabrook to come out to the Adams home in Pottstown to witness a signature. Their testimony indicated that they arrived at the house at the appointed time, not having known Mrs. Adams previously, and found her in bed but sitting up. The will was not read to her in their presence, nor was it read to them. They remained at the house for only 10 or 15 minutes, during which time there was a little chatter and conversation, irrelevant here in substance but which indicated that testatrix was normal in appearance and behavior. Mrs. Adams signed the document by herself without assistance, by leaning on a telephone book on the bed. She did not impress

either witness as unusual or noteworthy in any way, and they described her as a small woman, a little chubby, probably in her sixties, and with white hair.

The testimony of J. Edmund Mullin, Esq., the scrivener, also dealt with the circumstances of the preparation and execution of the will. Mr. Mullin had prepared two prior wills for Mrs. Adams, including the one dated August 16, 1969. He testified that on September 15, 1969, he received a call from Mrs. Adams while absent from his office, and upon returning the call, learned that she wished to revise her will. Mr. Mullin was in possession of the August 16th will, and got it out in order to note the changes which Mrs. Adams desired. He stated that he went through the will paragraph by paragraph, noting the changes and listened to testatrix' explanations of what she wanted done, and why. She said that she wanted to remove her grandchildren as the main beneficiaries because they paid her no attention, and the same applied to the Visiting Nurse Association, another legatee. Mr. Mullin further testified that he reviewed Mrs. Adams' holdings extensively, because he wanted to be sure that she knew exactly what she was doing and so that he fully understood the reasons for the changes. Mr. Mullin mailed the revised will to testatrix and received it back executed a couple of days later.

Little of the evidence relates closely to the time of execution of the document in question, and what does is not helpful to contestants. They apparently seek to invoke the rule of Guarantee Trust & Safe Dep. Co. v. Waller, 240 Pa. 575, which holds that where a testator is subject to "senile dementia" generally, i.e., a general mental incapacity, he will lack testamentary capacity. Contestants refer particularly to section 3.3M of Aker's work, supra, listing certain factors which, at least cumulatively, indicate the existence of senile dementia. These are, in part, impulsive behavior, unfounded suspicions, false beliefs, difficulty in think-

ing and incoherence, forgetfulness, delusions, excessive recollection of events long past, and a general reduction in intellectual capacity. Contestants allege that testatrix exhibited most or all of these characteristics, and we will discuss the evidence with this contention in mind.

Impulsive behavior is allegedly shown by the fact that in 1969 testatrix walked 10 blocks to a shopping center with her sister, although not physically well, and also procured a friend, Grace Hartenstine, to become a joint holder of her safe deposit box but changed this again within a week. Unfounded suspicions are supposedly illustrated by testatrix' doubt that Mrs. Lois Betz, a visiting nurse, was, in fact, a nurse, although Mrs. Betz had been to her home on a prior occasion; also that her neighbors were trying to put her in a home and were bringing her food which she feared to eat, and had stolen dishes from her, which she had, in fact, given away. False beliefs are supposedly shown by testatrix' belief that she had a heart attack when she did not, that her legs were paralyzed when they were not, and that she told Grace Hartenstine in 1967 that no one came to see her in the hospital when this was not true.

There was some testimony that testatrix' behavior was incoherent, rambling and repetitious, and that on one occasion she had had trouble recognizing a neighbor whom she knew well. Forgetfulness was illustrated by the necessity of putting her medicine in separate containers to help her remember when to take it, and, in addition, that testatrix forgot that she had given her husband's tools to Morgan Davis, her son-in-law, and tried to give them to Grace Hartenstine. Mrs. Hartenstine also testified that decedent talked incessantly about events long past when she lived in Mahanoy City early in her life, and other witnesses commented that she talked a great deal about her deceased husband and her dogs. General

reduction in intellectual capacity is supposedly found in testatrix' inability to write out a check correctly, her improvident eating, her states of depression and her confusion and indecision in an attorney's office when she went to him specifically to have a new will prepared.

At best, these occurrences, spread over more than a two-year period, are only detached episodes in the life of a lonely and unhappy woman who desired more attention than she received. Upon close scrutiny, they do not rise to the standard of proof required in cases such as the present. Contestants, although making strenuous effort, in many cases were unable to supply more than a vague or approximate time of the occurrences, and they ranged from at least two years before the execution of the will until almost the time of testatrix' death eight months afterward. Over the same period, considering the record as a whole, there is ample countervailing evidence to show that, in general, testatrix was aware of her personal and business affairs and in most cases had definite and logical reasons for her statements and actions. What behavioral aberrations there might have been, clearly stemmed from testatrix' physical problems and her personal attitude about them and toward others, not from any general intellectual decline.

Several witnesses in the case emphasized that on various occasions, over most of the period in question, Mrs. Adams would appear drowsy, lethargic and somewhat incoherent. There was ample testimony to show that testatrix was extremely conscious of her physical condition and personal comfort, and in fact overemphasized her stomach, circulatory and other ailments. As a result, she took medicines in great quantity, some of them sedatives, and in some cases continued to renew prescriptions of this sort which had been given to her years previously. Her medical records indicated several times that she was oversedated,

usually by her own act, and this, coupled with the fact that she often would not make the effort to eat proper foods, or enough food, increased the effects of the drugs. However, even if there were addictive aspects to her use of drugs, this, by itself, is not evidence of testamentary incapacity: Kerr's Estate, 255 Pa. 399.

There is no question that testatrix had real physical ailments. An autopsy indicated circulatory disintegration and other ailments characteristic of advancing age. Contestants called as their witness, Dr. Edwin Anderson, testatrix' physician, but the only part of his testimony connected to her alleged mental decline was his use of the word "senility" in a provisional diagnosis made by him on October 28, 1969, but which he stated candidly was made specifically to be sure that she was admitted to a crowded hospital; Dr. Anderson said, moreover, that he might have well been in error in the use of the word. In any event, "senility," properly used, is a general characterization of the weakness and ailments, of every type, which are associated with old age; it applies to physical as well as mental deterioration, and even though in layman's terms it may imply some mental weakness, its use once by a physician falls far short of showing that general, profound mental decline which equates to testamentary incapacity.

Contestants obtained much evidence from Gordon E. Shanabrook, on crossexamination. He first met testatrix when she moved to Pottstown in 1966 and became his insurance customer. He testified that there was nothing special or unusual about his relationship with her until September 2, 1969, when he was called on the telephone by two of testatrix' neighbors, asking him to assist them in getting her to the hospital. Parenthetically, there is a little evidence in the case that Mr. Shanabrook had performed a few personal services or favors for Mrs. Adams before this date, such as driving her home from the hospital on a prior occasion,

but none of them indicated more than a normal or casual relationship between the two persons. However, starting with testatrix' hospitalization on September 2, 1969, Mr. Shanabrook generally assumed responsibility for the management of her affairs, by assisting her in drawing checks, paying bills, obtaining food, and otherwise caring for her needs, both while she was in the hospital and after she returned home. The Shanabrooks saw Mrs. Adams every day or two, and also talked to her on the telephone. From September 1969 until her death, they assisted her in many ways to cope with her lonely personal state and her health problems.

Mrs. Adams' family situation at this time was not happy. She felt estranged from Phillis M. Davis, her oldest daughter, because of an incident which occurred at a party in 1968; thereafter, there was some friction between them, although they saw and spoke to each other occasionally. Mrs. Davis conceded that during the six months prior to the execution of the will she did not assist her mother in shopping or other chores of that nature, as she had done before. Testatrix' other daughter, Lois M. Bailey, is divorced and presently resides in Harrisburg, Pa., and suffers from substantial emotional difficulties. Mrs. Davis' daughter, Barbara Bouchard, was close to her grandmother for some time, but as she grew older and was married, drifted away to some extent, although she saw her grandmother more than did the other grandchildren, who reside out-of-State. Mrs. Mae Wertz, testatrix' niece and coexecutrix, testified (together with a neighbor who had done some cleaning for her) that testatrix used her physical problems to attract pity and sympathy. It appears that the Shanabrooks responded to this, and her family did not.

Thus, the picture portrayed is one of some abnormality in behavior and attitude on the part of testatrix,

but not the type of abnormality that would diminish her ability to make a will. The example given of her impulsive behavior shows uncertainty rather than irrationality, and, indeed, seems to indicate a sound understanding of the value and importance of the items contained in the safe deposit box. Her suspicions of Nurse Betz are not too strange, since Mrs. Betz had seen her only once a long time before the telephone conversation in question and she had seen other nurses in the interim. The facts concerning her fears about the neighbors are so vague, both as to what occurred and when, that they are not helpful. Her so-called false beliefs about her physical condition are not strange in a person who appears to have been neurotic in this area already, and even if they were incorrect medically, they may, nevertheless, have been genuine.

Nor do we believe that testatrix did not know the nature and extent of her property. It is true that she made a few statements to the effect that she had no money except her Social Security payments. However, at least some of these statements were made in order to avoid spending money, as where she caused Mrs. Hartenstine to pay her safe deposit box fee. The record shows that she was aware of her ownership of her house; she was aware of her savings account, because she arranged for Mr. Shanabrook to withdraw funds from it on one occasion; she was clearly aware of her checking account, as she used it constantly. The fact that she often gave Barbara Bouchard more money than she needed when she sent her shopping, "to make sure" she had enough, means little to us, because Mrs. Bouchard testified that she always brought back the correct change, as Mrs. Adams learned to know.

There is, therefore, ample evidence to show that testatrix was an unhappy, lonely and confused woman, who relied excessively on medication and who

felt neglected and was full of self-pity. However, "Neither old age, nor its infirmities, including untidy habits, partial loss of memory, inability to recognize acquaintances, and incoherent speech, will deprive a person of his right to dispose of his own property": Higbee Will, 365 Pa. 381, 384. When this will was prepared and executed by testatrix, it is clear that she was in command of her faculties, understood what she was doing and what property she owned, and had reasons based on established facts, for leaving it as she did. More than this is not required to show that she had testamentary capacity.

Less need be said about the charge of undue influence. Contestants quote from Ash Estate, 351 Pa. 317, as follows:

"To constitute undue influence sufficient to void a will, there must be imprisonment of the body or mind, fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery, or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of a will."

Contestants proceeded on the theory that proponent, under all the circumstances, bore the burden to prove that there was no undue influence exerted on testatrix. They asserted that a confidential relationship existed between him and testatrix, and that this fact, coupled with her mental and physical weakness and a will made in favor of a stranger, shifts the burden of proof. This rule, as stated, is, of course, correct, but we find it inapplicable. Although we may assume, without deciding, that a confidential relationship existed, testatrix was not a person of weakened intellect, as we have already shown. Further, Mr. Shanabrook had the closeness of contact with testatrix required for the exertion of undue influence over the

affairs of another for only about two weeks before the will was executed, and for much of this period saw her only in the hospital. Certainly, the attention given testatrix *after* the execution of the will cannot taint it, even if one of proponent's motives was to stay in her favor. Care, kindness and attention do not equal undue influence: Olshefski's Estate, 337 Pa. 420. And even though Mr. Shanabrook's role in having the will executed and witnessed was substantial, the will was, nevertheless, drawn by a reputable attorney after full discussion with testatrix herself, and this, in itself, requires us to regard allegations of improper conduct in its preparation with great caution: Thompson Will, 387 Pa. 82. Cf. Heffner Will, 19 Fiduc. Rep. 542. We, therefore, must hold that contestants had the burden of showing undue influence, and have failed to show that Mr. Shanabrook actively procured the making of the will in question by any conduct amounting to the improprieties described in Ash Estate, supra.

Accordingly, July 9, 1971, the appeal from probate is dismissed, and the writing dated September 16, 1969, is held to be the last will and testament of H. Marian Adams.