619 A.2d 280

**ESTATE OF Ylynne M. FULTON, Deceased.**

**Appeal of Dolores FULTON, Administratrix of the Estate of Ylynne M. Fulton, Deceased.**

Superior Court of Pennsylvania.

Argued Sept. 30, 1992.

Filed Dec. 2, 1992.

Reargument Denied Feb. 11, 1993.

134

Mary C. Frye, Harrisburg, for appellant.

Gary E. French, Harrisburg, for participating party.

Before CAVANAUGH, McEWEN and KELLY, JJ.

McEWEN, Judge:

We must in this appeal determine whether the *en banc* Orphans' Court properly concluded that the distributable es-

tate of the instant intestate decedent should be distributed to the husband who survived her but from whom she had been separated, or to her surviving parents who assert that the husband forfeited his rights to her estate. Since our study compels us to the conclusion that the surviving husband forfeited his statutory interest in the estate, we are obliged to set aside the decision of the court *en banc.*

Ylynne M. Fulton died intestate on April 5, 1988, survived by her husband, Lloyd Spinner (hereinafter appellee), and her parents, Bernard Fulton and Dolores A. Fulton. The Register of Wills of Philadelphia County granted Letters of Administration to the mother of decedent, Dolores A. Fulton (hereinafter appellant). It is undisputed that decedent and appellee had been separated for several years prior to her death. The trial judge responsible for the audit concluded that appellee had forfeited his intestate spousal share. When appellee filed exceptions to this adjudication, the court *en banc* determined that the auditing judge had erred and ruled that appellee had not forfeited his intestate spousal share, so that, as a result, he became, by reason of the statutory requirement (20 Pa.C.S. § 2102(2)) the principal beneficiary of the total distributable estate of approximately $37,000.00.

The audit court succinctly stated the following facts in the Amended First and Final Account:

> Fulton and Spinner first met in the summer of 1983 at the home of Spinner's mother and step-father in Woodstock, Virginia. Fulton's mother was related to Spinner's step-father and through this family connection was visiting their home.

> At the time of the introduction, Fulton was a 26–year–old college graduate, who traveled extensively in her position as the East Coast sales representative for *Essence* magazine. Spinner was a 33–year–old high school graduate who worked at Avtex Industry in Middletown, Virginia. Their backgrounds and life styles were disparate. Spinner, who described himself as a "small town guy" was concerned about the differences in their education. Nevertheless, their relationship developed over the next year, with Fulton

visiting Spinner when her job brought her to the Washington, D.C. area.

Sometime before August, 1984, Fulton invited Spinner to accompany her on a trip to Hawaii for which she paid the expenses. The couple decided to marry there and the marriage occurred August 2, 1984. They returned to Virginia a few days later, but their co-habitation was short-lived. The testimony is conflicting as to whether Fulton moved out of the couple's apartment in September, October or November 1984, but it is clear that she moved without notice and that she never returned. Spinner's testimony that she left in November is not credible in light of the vagueness with which he recalled most dates and time-frames in his testimony and the certainty with which other witnesses testified that Fulton had left him before her birthday, which was September 27.

Kimberly Fulton, decedent's sister, helped her move and testified that they packed clothing, dishes, plants and similar items and left while Spinner was at work. She also testified that her sister left a brief note for Spinner, stating "I'll be in touch" or words to that effect. Spinner agrees that was the substance of the note. There is no evidence that an argument or specific dispute led to Fulton's departure. Rather, the testimony suggests that Fulton had been disappointed to have been turned down for a job she had wanted in that vicinity and seemed not to have adapted to life in rural Virginia.

Spinner testified that he was despondent upon learning that Fulton had left him and did not work for a few days. However, he made no effort to communicate with her or to persuade her to return. Fulton called him after five or six months and between their separation in the fall of 1984 and her death in April, 1988, their only communication consisted of two or three telephone calls and two "thinking of you" notes, all initiated by Fulton. Although Spinner testified that he did not know where Fulton could be reached much of the time, he could readily have ascertained her whereabouts through her mother, who was a cousin of Spinner's

step-father and who maintained an active communication with Spinner's step-aunt. In fact, the extent of Spinner's effort to inquire about Fulton was to ask his step-aunt if she knew anything of Fulton's whereabouts. According to Spinner, the response was negative, except a report that Fulton at one point was living with her father. Fulton's parents were divorced. Her mother lived in Harrisburg and her father in Atlantic City. Spinner had met both, however, and could have contacted either of them had he chosen to reach Fulton.

Although he made no attempts at a reconciliation, Spinner testified that Fulton would have been welcome to return. The sincerity of Spinner's sentiment is questionable, however, as by March or April of 1985, within six months of Fulton's departure, he had begun cohabiting with another woman in her house in Harrisonburg, Virginia. Spinner, by his own admission, fathered a full-term baby born to that woman on January 27, 1986. Spinner has acknowledged paternity and accepted all accompanying rights, duties and privileges.

During that period, Fulton had likewise moved on with her life, and took jobs and lived in Connecticut, Atlantic City, and Philadelphia. She also held herself out as single and lived that life style.

It was not until three and one-half years later, upon Fulton's murder in April, 1988, that the technical specter of the otherwise long expired marriage emerged. Bernard Fulton, decedent's father, learned from the Philadelphia Medical Examiner that his daughter's body would not be released without her husband's consent. Mr. Fulton telephoned Spinner who authorized Fulton's parents to make the funeral arrangements and take her personal possessions. Spinner and his parents attended the funeral and he testified that he offered to assist. However, Spinner did not participate in the funeral planning or payment, abdicating all control to decedent's parents.

The existence of the marriage re-emerged as an obstacle in obtaining Letters of Administration on Fulton's estate.

Bernard Fulton and Dolores Fulton learned that the renunciation of Lloyd Spinner was required before Letters of Administration would be issued. Upon request, he renounced in favor of Dolores Fulton to whom Letters of Administration were issued. There was then no expectation that decedent's estate had any value beyond personal effects and insubstantial bank accounts. Subsequently, it was ascertained that life insurance policies were payable to the estate. Following receipt of the notice of audit and proposed distribution, Spinner appeared at the audit to claim his marital share.

Appellant urges this Court to reverse the final decree of the court *en banc* and to reinstate the decision and decree of the audit court which awarded the assets of the Estate to decedent's parents in equal one-half shares. Appellant essentially argues that the *en banc* court erred in setting aside the trial court's finding that appellee consented to the separation and thereby forfeited his intestate spousal share in the estate.

Our esteemed colleague, Judge Justin M. Johnson, reiterated for this Court the standard of review which is to here be our guide:

On appeal, the findings of an Orphans' Court judge who hears testimony without a jury are entitled to the weight of a jury verdict. *In re: Masciantonio's Estate*, 396 Pa. 16, 151 A.2d 99 (1959). This rule is particularly applicable "to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony." *Herwood v. Herwood*, 461 Pa. 322, 336 A.2d 306 (1975). In reviewing the Orphans' Court's findings, our task is to ensure that the record is free from legal error and to determine if the Orphans' Court's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence. *In re: Estate of Damario*, 488 Pa. 434, 412 A.2d 842 (1980).

*In re: Estate of Dembiec*, 321 Pa.Super. 515, 519, 468 A.2d 1107, 1110 (1983).

■ Our study commences, of course, with examination of the Probate, Estates, and Fiduciaries Code, specifically Section 2106(a), which provides:

Section 2106. Forfeiture

(a) Spouse's Share.—A spouse, who for one year or upwards previous to the death of the other spouse, has willfully neglected or refused to perform the duty to support the other spouse, or for one year or upwards has willfully and maliciously deserted the other spouse, shall have no right or interest under this chapter in the real or personal estate of the spouse.

20 Pa.C.S. § 2106(a).

The statute, therefore, precludes participation by a spouse in the distribution of the estate of a deceased spouse when the surviving spouse for a period of one year (1) "willfully neglected to ... support" the deceased spouse, or (2) "willfully and maliciously deserted the other spouse". Appellant does not contend that appellee failed to fulfill the obligation to support the decedent. Thus, our focus is upon the question of whether appellee "willfully and maliciously deserted" the decedent.

Since it is undisputed that the decedent, and not appellee, departed the apartment which had been the residence of the newly married couple, appellee cannot be said to have "maliciously deserted" the decedent at the time of the separation. Nor did the audit judge so conclude. Rather, the trial court determined that the separation of the parties was consensual. It is the resolution of that quite precise issue and narrow question—did appellee consent to the separation—which controls disposition of this case because the Pennsylvania Supreme Court held in *In Re: Archer's Estate*, 363 Pa. 534, 70 A.2d 857 (1950)[1], that once a spouse, subsequent to a consensual separation, violates marriage vows, the spouse forfeits all

1. The statutory forfeiture provision here applicable, Pennsylvania Probate Estates and Fiduciaries Code, 20 Pa.C.S. § 2106, 1972, June 30, P.L. 508, No. 164, § 2, eff. July 1, 1972. As amended 1974, Dec. 10, P.L. 867, No. 293, § 5, imd. effective, mirrors the statutory forfeiture provision which was the subject of the 1950 Supreme Court decision in *In Re: Archer's Estate, supra*, specifically, the Intestate Act of April 24, 1947, P.L. 80, No. 37, § 6, 20 P.S. § 42.

right or interest to the estate of the other spouse. In the instant case, appellee does not dispute that he engaged in adulterous conduct and, in fact, admits that he fathered, by another woman, a child who was conceived within six to eight months of the separation.

We have carefully studied the record during our consideration of the question of whether the separation of the parties was consensual and are compelled to the conclusion that there is a sound evidentiary basis for the determination of the eminent Judge Judith J. Jamison who as audit judge concluded that "the separation of the parties, though initiated by [the decedent], was a consensual one under the law". The audit court relied, of course, upon the conduct of appellee subsequent to the separation and recounts in an able opinion:

Spinner testified that he was despondent upon learning that Fulton had left him and did not work for a few days. However, he made no effort to communicate with her or to persuade her to return. Fulton called him after five or six months and between their separation in the fall of 1984 and her death in April, 1988, their only communication consisted of two or three telephone calls and two "thinking of you" notes, all initiated by Fulton. Although Spinner testified that he did not know where Fulton could be reached much of the time, he could readily have ascertained her whereabouts through her mother, who was a cousin of Spinner's step-father and who maintained an active communication with Spinner's step-aunt. In fact, the extent of Spinner's efforts to inquire about Fulton was to ask his step-aunt if she knew anything of Fulton's whereabouts. According to Spinner, the response was negative, except a report that Fulton at one point was living with her father. Fulton's parents were divorced. Her mother lived in Harrisburg and her father in Atlantic City. Spinner had met both, however, and could have contacted either of them had he chosen to reach Fulton.

Although he made no attempts at a reconciliation, Spinner testified that Fulton would have been welcome to return. The sincerity of Spinner's sentiment is questionable, howev-

er, as by March or April of 1985, within six months of Fulton's departure, he had begun cohabiting with another woman in her house in Harrisonburg, Virginia. Spinner, by his own admission, fathered a full-term baby born to that woman on January 27, 1986. Spinner has acknowledged paternity and accepted all accompanying rights, duties and privileges.

*　　*　　*　　*　　*　　*

Contrary to the arguments of Spinner and his counsel, we find that the separation of the parties, though initiated by Fulton, was a consensual one under the law. Spinner claimed that initially he did not understand Fulton's departure to be permanent, in light of the ambiguity of the note stating "I'll be in touch" and Fulton's habit of coming and going independently. Yet, he knew she had moved a substantial portion of her and their belongings, and he testified that he was unhappy and unable to work for a time thereafter. Spinner placidly acquiesced in the situation, letting Fulton take the lead as she had in most aspects of their relationship. By his own words, it was her idea to get married and her idea to leave the marriage. He took no meaningful steps to communicate with her or to revitalize the marriage and cohabited with another woman in a lifestyle which unequivocally demonstrated his attitude that no marriage existed. When asked whether he consented to Fulton's leaving him, Spinner replied, "No, not at all". Since there had been no prior discussion between the parties about separating, it is no doubt true that Spinner did not verbally consent. Yet, when asked whether he went along with Fulton's plan to leave, Spinner said, "I had to. I didn't want to". When Spinner returned one of Fulton's telephone calls and a male answered the telephone, Spinner admitted he assumed that she was seeing other men at that point. Yet he did not inquire about the identity of the person, admitting "It wasn't my business". Spinner's passivity demonstrates that he concurred that the marriage was over and that he claimed no spousal rights. Tacit consent to the separation was clearly proved.

Surely there is an abundant evidentiary basis for the findings of the audit court:

That appellee had "placidly acquiesced in the situation". That appellee's "passivity demonstrates that he concurred that the marriage was over and that he claimed no spousal rights".

Thus it is that we, however deep our respect for the individual insight and judicial wisdom of the members of the *en banc* court, unreservedly differ with the conclusion of the court *en banc* that such placid acquiescence and passivity is "not supported by competent evidence".

■ How, in the face of so persuasive a summary of the evidence as presented by the audit judge, did so sage a court *en banc* conclude that the evidence did not support a conclusion that the separation was consensual? While the unwary proceed directly to speculation, the wary first seek forgiveness, and so it is that, with request for pardon, we observe that the court *en banc* seems to have imposed upon the examination of the evidence the requirements that the consent of appellee have been both *expressed* and *contemporaneous* with the departure of decedent. Surely, however, the essence of a separation can be transformed, so that a separation, nonconsensual at the outset, can become a separation which is consensual on the part of both spouses—as well, of course, as vice versa. *In re: Fisher Estate,* 442 Pa. 421, 276 A.2d 516 (1971). Nor is such transformation only to be effected by an explicit statement since, as the knee-high adage recites: "Actions speak louder than words". Application of such notions to the evidence of the conduct of appellee subsequent to the separation would permit the argument that appellee proceeded far beyond "passivity" and "placid acquiescence" in the separation, and even that he effected a *de facto* divorce since he behaved as would a divorced individual, and demonstrated that he considered the marriage over.

While it remains for the legislature to study and decide whether scrutiny and revision of the Probate Act is necessary or desirable by reason of the mores of a society which inspired legislative enactment of no-fault divorce, when an individual

may lawfully shed a marital partner, without the express consent of that partner and by reason of little more than the passage of time, it hardly seems critical for the judiciary to proceed to rigid interpretation of a forfeiture statute. In any event, we find that the estate must be distributed to the parents of decedent since we agree with the audit court that appellee consented to the separation and thereby forfeited his intestate spousal interest in her estate.

The order of the court *en banc* is reversed. The order of the audit court is reinstated. Case remanded for proceedings consistent herewith. Jurisdiction relinquished.